Our third case, U.S. Metals v. Liberty Mutual. Alvarez. May it please the Court. My name is Greg Alvarez. I'm here on behalf of the appellant, U.S. Metals, in this case. U.S. Metals is a distributor of oilfield products. And this particular product that's at issue in this case is a flange. We supply 350 flanges to Exxon Mobil Corporation for its Baytown and Baton Rouge facilities, refineries. Now, one thing I want to make clear from the outset is that U.S. Metals is not asking for coverage for its flanges. This is an insurance coverage dispute. And U.S. Metals, what they are actually asking for is the damages and so forth that were incurred on other property. That other property was Exxon Mobil's in this case. And the issue that I think is really germane to this case is what was expressed in Aubrey, the Fifth Circuit opinion in Aubrey in 2009. And that is that the interpretation of an insurance contract, if the insured's interpretation is reasonable, even if it is less reasonable than the insurance carrier's, that interpretation of the insured wins the day. That is the interpretation that is understood. Now, U.S. Metals believes that its interpretation is reasonable in this case. In fact, what we've provided to the court is two different cases, the Elger case and the Isaac Corp case, two quotations from those two cases where we believe that Liberty Mutual themselves agreed with the interpretation that is consistent with U.S. Metals' coverage opinion and interpretation in this case. In the Elger case, the Liberty Mutual stated that their alternative argument was that property damage was unquestionable when the removal of the plumbing, the defective plumbing in that case, caused damage to other property, other property within the homes. That was Liberty Mutual's alternative argument. Similarly, in Isaac Corp, Liberty Mutual conceded the fact that damages that occurred on other property other than the defective welds was something that was included in the coverage of the policy. Those are CGL policies. Now, in addition, this case turns on, we believe, the interpretation of the impaired property exclusion. It's exclusion M within the CGL policy. And the impaired property exclusion actually has two different aspects to it. One is there is no coverage if there's impaired property. If your product, which is defective, causes property damage to impaired property. Well, what is impaired property? Impaired property is tangible property that is rendered unusable or less useful because your product has a defect in it or thought to have a defect in it, but only if, and this is the key, but only if the replacement of your product, which is a specific and defined term within the CGL policy, only if the replacement of your product can render, in this case, the refineries at Baton Rouge and Baytown usable again. That could not happen. And why could that not happen? It could not happen because these flanges were welded in flanges. So what does that mean? When you weld something together, you fuse two components together to make a single unit. And so the only way to remove these flanges, and it is an undisputed fact in this case, that the only way to remove these flanges from the installation, from the welded installation, is to cut them out. That caused damage to other property. It caused damage to insulation, to bolts, to gaskets, to where they had to flame cut the flange out. Whatever the component is that you actually weld the flange to is then physically injured. So in other words, simply the replacement of a flange would not make the refineries useful again. You had to go beyond that. There's other physical injury. So we don't believe that the impaired property definition has been met in this case. So what the other aspect of the impaired property exclusion, exclusion in, is property that has not been physically injured. That's the other half of the exclusion. So we argue in this case that, yes, indeed, there has been physical injury to other property. And that physical injury is twofold, we believe. Once, during installation of the actual flange, during the welding process itself. And second, and more consistent with the way Liberty Mutual argued in the Elger case, their alternative argument, that when you remove this component that has been integrated permanently within another structure, it causes physical injury. By the express terms, if you look at the express terms of exclusion in, it says physical injury to property. Here we have that. There is no qualification in that language as to how, why, or when that physical injury takes place. Can I ask you a question? Yes. If the property's not damaged, when you stop right there, is there a difference? Because first, you have to have property damage. Correct. And if there's no property damage, then when you stop right there, you don't even have to get to impaired property. I guess I'm having trouble understanding that transition. Because if it's a flange, it screws on. No, ma'am. I mean, if it were, and all you did was unscrew it, then that pipe it was screwed to, there would be no property damage to it. That's absolutely correct. And so you wouldn't even get to the impaired property. That's exactly right. So why did we need the impaired property saying that there has to be property damage? It seems you've already said that. Correct. Well, the impaired property exclusion is designed for just the screwed-on type flange case. Because in that particular instance, you could have the impairment of the overall facility. You can't operate the facility if you have a defective flange attached to it because it's supposed to contain pressure. If it doesn't contain pressure, then you cannot use the refinery. You certainly do not want to use the refinery, correct? So in that instance, that's where the impaired property exclusion actually has usefulness. Because if there's a loss of use, but you can remove your product that is defective and only your product that is defective and replace just that, you can render it useful again. And that's where the impaired property exclusion actually works in the way that it's intended to, under the business risks exclusions, the intent behind those. Now, the other half. The business risk changes depending on whether it's got grooves or whether you weld it on. That the parties intended for the business risk to flip on that. Well, I wouldn't say that they intended it to flip on that. I think that that's a great example of it, however. Because what you do when you weld something together, and that's actually precisely where I'm going next, is during the installation of the flange, when you weld these two pieces together, you actually physically alter both components. I'm just asking you, you were talking about the overall arching business risk division, and you say as long as it's screwed on with grooves and you can unscrew it without damage, the parties intended that business risk not to be covered. That's correct. And now if you put some solder on there so that there's some damage to the appendage to which it's screwed, you say, well, that changes the party's perception of the allocation of the business risks. I would say the answer to that is yes. And the answer is yes because this welded-on flange, you don't screw it first. You basically just mate it up to the other component. But the important key factor is this, is it becomes a permanent connection. It becomes actually one with the entire process unit in this particular case. And because you have to physically harm other property, because you have to physically injure other property to remove it, that is the key difference here. It's just like in the grapevine case of the Fifth Circuit. In the grapevine case, what you had is asphalt overlaid with defective fill. The insurance product was the defective fill underlying the asphalt. The Fifth Circuit determined that the only way to get the defective fill out was to basically destroy the asphalt. And so you could not render the asphalt useful for the Walmart without destroying this other property, and therefore the impaired property exclusion did not apply. I guess maybe a bigger question is what is the business risk that's supposed to be the responsibility of the contractor as opposed to being covered by insurance? How far does that go? Right. Great question. The business risk should be only to the extent that you supplied the material. In this particular case, U.S. Metal supplied flanges up to a couple million dollars. Well, that was the risk that it was supposed to take as a business risk of getting to the transaction with ExxonMobil. That was the extent of it. However, damage to other property was certainly not, and that is outside of what the business risks or exclusions are supposed to cut out of coverage. Even though the damage to other property is a result of your defective work, contractor's defective work? Absolutely. I mean, it would be no different if the physical injury occurred by an explosion or a fire. It's damage to other property that was occasioned by our product, but that has still covered property damage. Does it make any difference that the damage was to the other party to the contract as opposed to a third party? That was to the other? Yeah, the contract was between U.S. Metals and the refinery, and the damage was to the refinery, not to some third party who happened to be on the refinery grounds. In this instance, it does not make any difference. It does not. So with respect to this case, the impaired property exclusion is the exclusion that I think is directly at issue. And with the authorities that we cite, and again, all we have to do as U.S. Metals is have a reasonable interpretation of the coverage analysis. We believe we have that. We believe we have that with the case authorities that we cite. There's nothing directly contrary to it in Texas law. And if that's the case, if our interpretation is reasonable and we believe that Elger and Isaac Corp and Grayson and these other cases that we've cited in our brief have a consistent opinion with ours and interpretation is ours, then we, by Texas law, should win, even if the court determines that Liberty Mutual's reasoning is more reasonable. And the last issue I'd like to cover is on the duty to defend. The duty to defend was also denied by Liberty Mutual in this case. The petition, it's the eight corners rule. And in the petition, ExxonMobil alleged that there was tangible damage to tangible property. They also alleged that there was a loss of use. Both of those are property damage that is covered under the policy. And third, a factual allegation of a leak. A leak in a petrochemical facility can lead to an explosion, can lead to property damage, and so forth. All doubts have to be determined in favor of the insured, in favor of coverage. What we have here, I believe, is a case where all doubts were instead resolved in favor of the insurance carrier. And that actually flows throughout the either you look at the duty to defend or the duty to indemnify. Instead of looking at the law and having a liberal construction in favor of coverage, we have the exact opposite. Now, it wasn't just the leak, too, the leak and the tangible property allegation and also the loss of use, but there's also an allegation that the facilities had to be repaired and that the flanges had to be replaced. That, coupled with the allegation that there are incidental and consequential damages, brings it within the duty to defend. Again, if there's a doubt whether or not there's a duty to defend, that falls in favor of the insured, not the insurance carrier. Some of the cost to defend was paid, correct? I just wondered what's still at issue. Right. Well, we believe we also have claims, extra contractual claims, statutory claims that there were misrepresentations, and also, most importantly, a failure to investigate on part of Liberty Mutual. And so the fact that they have paid the duty to defend those costs, they still maintained and denied the fact that they were responsible to pay those costs. And so in order to get to the extra contractual side of it, we've got to get a decision on that. Thank you, sir. We'll hear from Liberty Mutual. May it please the Court. Your Honors, my name is Lavon Hovnatanyan, and I represent Liberty Mutual in this case. Let me start with the issue of Elger and Essicorp and the alleged concessions that Liberty Mutual made in those cases when it was represented by different lawyers in other jurisdictions. For two reasons, those alleged concessions don't control this case or even apply in this case. The first is because of the longstanding Texas rule of no insurance by estoppel, a rule that this Court has applied on numerous occasions in Texas insurance cases. And under that rule, an insurance company can say or act however it wishes in a previous case, including paying claims of a certain category. And then in a later case, the question is, is it covered, not what did the insurance company do or say in the past. That rule goes back 100 years or so in the state of Texas. And for that reason, whatever Liberty Mutual said in Elger and Essicorp should not control here. The second reason those cases shouldn't control here is because what property damage is is a question of law. Liberty Mutual can agree, can stipulate, can be held to judicial admissions in any other cases on questions of fact that pertain to those cases. But the law is clear that a party's stipulation or admission on a question of law is basically a non-entity because questions of law are for the Court. And parties cannot agree on what the law is and then bind the Court with it. And so property damage being a question of law, insurance contract construction being a question of law, those are issues for this Court. It doesn't matter what Liberty Mutual said or how Liberty Mutual acted in another case. In regard to Elger, that case has a great history. The Seventh Circuit decided it in 1972. And they came out and said a defective plumbing system is physical injury to a home from the moment it's installed just because it's defective. Nine years later, the Illinois Supreme Court looked at the Seventh Circuit's eerie guess in its own version of the Elger case. The Illinois Supreme Court said, well, let's discuss what physical injury is. Physical injury, by the standard that we're supposed to apply, which is when a term is not defined in the insurance policy, you apply the common ordinary meaning. Physical injury is an alteration, a negative alteration in appearance, in shape, in color, or to quote the Court, or other material dimension. And the Court said there's no physical injury when a defective plumbing system is installed and then nothing happens. It's just the installation of a defective plumbing system. The home, the alleged impaired property, has not been physically injured. And the Court challenged the Seventh Circuit's decision to the contrary. And they pointed out where the Seventh Circuit, with due respect to that Court, went wrong. There's a remarkable passage in the Seventh Circuit's opinion where they say, when it comes to physical injury, we should at least determine what that term, what sort of purpose that term is intended to serve in this contract and go beyond what the plain ordinary meaning of the terms are. And the Illinois Supreme Court said, no, that's the opposite of what you're supposed to do. You're not supposed to look into this like judges trying to determine what did the parties mean, what could have been their, what is the unspoken intent. Instead, you apply the plain meaning of undefined terms and you lift the intent of the policy from the plain words that are used there. That's where the Illinois Supreme Court said the Seventh Circuit went wrong. And on that basis, they said, this is not physical injury. And that is almost identical to what we have here. The flanges installation did not cause a physical injury. There was no damage at all until they were removed. Of course, that's a separate issue. But the installation of those flanges under the Illinois Supreme Court's correct Elger decision would not constitute a physical injury in this case. What about the welding, the fact that they were welded? Because, you know, to weld something, you have to affect both parts. Correct. Correct. Well, Your Honor, let me just, not to parse your question, but believe it or not, that's really two questions. It's a question as to the duty to defend and a question as to duty to identify. As far as duty to defend, when the court just looks at the eight corners, the well-established analysis, ExxonMobil didn't plead how the flanges were installed. And, in fact, to their credit, U.S. Metals concedes in their brief, ExxonMobil didn't specify in their pleadings whether these were screw-in or weld-in. They didn't, ExxonMobil didn't say how the flanges got there, and they didn't say what was necessary to remove them. So that's the first answer. The second answer is as to the duty to indemnify, where we get to look at the actual facts that were established in the underlying lawsuit. Yes, they were welded in. That's true. And that gets to the issue of, well, then, when those welds are broken, when they're deconstructed to take the flanges out and replace them with new, proper flanges, is that something that Liberty Mutual must pay for under the policy? You can take that a little further and say, what about the insulation? What about the gaskets? What about the temperature coating? And the answer to each of those is no. No, it's not something Liberty Mutual is responsible for under the party's contract. The best case on this is Gentry Machine Works out of the Middle District of Georgia in 2008. In that case, defective pedestals were incorporated into boilers, and like the flanges made the units here inoperable, the pedestals in that case made those boilers inoperable. The only way that the boilers could be rendered usable was to replace the pedestals. But in order to do that, the contractors had to come through and cut through the outer skin of the boiler, the insulation. They had to cut through the insulation, and they had to move catwalks that had been installed in that particular area of the boiler. And the Middle District of Georgia said none of those things are covered by the policy. That deals with the repair and the replacement of the defective part. It's impaired property, the boilers are impaired property, and those items aren't covered, even though other things were damaged when the contractor had to get through and repair the pedestals, they weren't covered. Just like in this case, Judge Gilmore correctly concluded that the gaskets and the welds and the insulation and the temperature coating was not something Liberty Mutual had to pay for because it was not covered by the contract. Counsel Opps, it's sort of overarching argument to us is that even if your position, your client rather, is a correct reading, his client's is a reasonable reading, and thus, if it's reasonable, construing the policy in favor of the insured or a Trump's thing, so to speak, would you respond? Certainly, Your Honor, and we have no quarrel with the law in that area. That's absolutely right. If they have a reasonable interpretation, we lose, even if our interpretation is more reasonable. The problem, of course, is their interpretation is not reasonable. The impaired property exclusion does not, well, let me, and I always hate to read to a court, but in this case, the verbiage is so important. Part of the definition of impaired property is if such property, if such property can be restored to use by the repair, replacement, adjustment, or removal of your product or your work or you're fulfilling the terms of the contract or agreement. Now, they say, well, okay, it's true. You had to repair and replace or you had to remove and replace the flanges, but look at everything else that got damaged, and so it's not just the flanges. Why isn't that a reasonable interpretation? It's not a reasonable interpretation because the policy doesn't say that. There's nothing in the policy, for instance, that says of your product or your work and nothing else. If there's something in there that says nothing else can be touched, then two things are going to happen. The first thing is no insurance company is ever, ever not going to have coverage in a CGL case involving this exclusion. It's never going to apply. And the second thing that would happen is the court respectfully would be adding words to a policy to make it mean something other than what it means today. And under the well-established standard, the court is supposed to, as the Illinois Supreme Court did in Elger, is supposed to apply the plain meaning of the undefined terms and stop there and not read words into the policy. And I think one of the standards, and this court has quoted it several times, is the court is not to imagine scenarios in which there would be coverage. It's not to read facts into the pleadings. It's not to change the meaning of the policy when it applies the eight corners analysis or when it construes what the insurance policy means. But respectfully, I think the court has to in order to find, for Liberty Mutuals in this, for, pardon me, for U.S. Metals in this case. That's what Judge Gilmour was unwilling to do. Do you think that it's at least ambiguous when the language says repair and replace? Because obviously the parties in this case have different interpretations. Different courts have interpreted it differently. Very true. Does that mean that it's ambiguous? It does not, Your Honor. And Texas courts have spoken to this. The Supreme Court of Texas has spoken to this several times. I'm sure Judge Owen will remember. I believe this court has also said that the great quote is ambiguity is for this court to decide. And there's language in those cases where courts have said, look, if we're going to say contract language is ambiguous because some other court decided it means something different or there's differing interpretations from other courts, then what job are we doing? Then all we say is, well, people disagree. Courts disagree. Those are good courts. They disagree. Therefore, it must be ambiguous. And so there's our opinion. That's not the court's duty. The court's duty is to decide ambiguity, as you know better than me, is to decide ambiguity, whether it is ambiguous. And if it is, then what it means. And the same principle applies to the parties. There's no doubt Mr. Alvarez is a terrific, intelligent attorney. We have no quarrel with anybody that works for his client. We just have an intellectual disagreement over what this policy means. But no court should look at that and say, well, then it's ambiguous. I'm not suggesting that. What's the result, in your opinion, if it is ambiguous? What next? Boy, that's a great question, Your Honor, because no one has argued that it is ambiguous. I think if the court could throw that ball up to itself and say this is ambiguous, and boy, we ask you not to do that. But if you were to do that, then I think as an officer of the court, I have to tell you my honest opinion is you've got to reverse and remand and send it back down to the district court for there to be a trial, I suppose, on the party's intent. We suggest that's the wrong result in this case because— I thought the law was if it's ambiguous, you constrain coverage in favor of the insured. Well, Your Honor, well, I believe that's true. I think essentially your opinion says there's coverage, it's ambiguous, and therefore the tie goes to the insured. But I still think a trial is unavoidable at that point because you certainly reverse and remand and you go down and then we have to have a trial to make a determination on the facts of what's owed and what's not. So I don't disagree at all. I think in that case, tie goes to the insured, you reverse and remand, and you have a trial. On the amount of damage. Correct. Let me briefly address Grapevine, this court's opinion from 1999. I want to first say we have no quarrel with that case. It just does not apply here. In Grapevine, as Mr. Alvarez said, it's a parking lot with asphalt and fill had been installed under the asphalt. It turned out that the fill was defective, and a key fact in that case is because it was defective, it damaged the asphalt. So with the asphalt damaged, it was not true in the words of the exclusion that the asphalt could be restored to usable condition just by repair or replacement of the fill. It was impossible because it had already been damaged. And so what this court said was because it can't be restored to use by repair or replacement of the fill because it's been damaged, the impaired property exclusion does not apply. We have no quarrel with that. It's just that it doesn't apply here because the non-road diesel units in this case could be restored to usable condition just by removing and replacing the flanges. So for that reason, we respectfully suggest Federated v. Grapevine does not apply in this case or does not control in this case. I don't know that I've ever given back four and a half minutes, but I'm happy to do that. All right. You hit the areas that he mentioned, especially in what you spoke about Grapevine, so we appreciate your argument. Sir. Thank you. Mr. Alvarez? Yes. A few points on undervoto zone. First of all, we are not citing Elger and Isaac Corp. to say that that is anything other than that our interpretation is reasonable. We believe that Liberty Mutual had it right in those cases when they conceded and said that there was unquestionably going to be damage to the house caused by the removal of the defective plumbing. All we're using those cases for is to suggest that our interpretation is in fact reasonable because they have said in other cases that that's the position that they took. His argument is that your position isn't reasonable because what you say the policy says doesn't say that and that we would have to read language into the policy to get to where you are. I think that's what he said. That's correct, Your Honor, and the only thing I'm saying with respect to Elger and Isaac Corp. is the reasons why we're using those cases is to suggest our interpretation is reasonable. Now let me get to your question on why it's not accurate that we're trying to read things into this policy. If you look at the impaired property exclusion and specifically at the definition of impaired property, which is what counsel pointed to and actually I think read from, there's an important part of that exclusion, and what it is is the quotations around your product, and that is very specific. This court in many cases has determined that your product means only your product. It is repair and replacement of your product, and again, U.S. Metals is not asking any type of damages for the replacement of its product. It is instead asking for the costs and damages that occur to other property, which is just not mistaken in this case whatsoever. Now with respect to Grapevine, in Grapevine, really you have to look at what's going on in that case. The actual physical injury to the asphalt did not cause the opinion to go the way that it did. It was in fact the fact that they had to destroy the asphalt to get to the fill is why the asphalt was no longer usable because of the defective product, and that's why the impaired property definition was not applicable in that particular case. And again, we believe it is an oversimplification. It is superficial. If you actually look at the language that's used in the insurance policy, if you say that your product or the impaired property exclusion negates you looking at damage and physical injury to other properties such as the flame cut that you had to do to whatever the flange was actually welded to, the work of the welders and so forth, that was destroyed. There's no question about it. That other component in work was actually physically injured. All right. Thank you.